### THE CIUDAD DE REUS.

(District Court, E. D. New York.   November 9, 1909.)

SALVAGE (§ 8*) — NATURE OF SERVICE — ASSISTING VESSEL AFTER COLLISION — "SALVAGE SERVICE."

The services of three tugs in freeing a steamship whose anchor chain, while anchored off Staten Island, had become fouled with that of another anchored vessel after a collision between them during a high wind, which still continued, *held* "salvage service," and entitled to be compensated as such; also, after such tugs and others had towed the steamship across the bay to a dock, which was an ordinary towage service, their further service in rescuing her, when she had been broken loose from her moorings by the gale, and in protecting her from further injury by striking against the wharf, was a "salvage service."

[Ed. Note.—For other cases, see Salvage, Dec. Dig. § 8.*

For other definitions, see Words and Phrases, vol. 7, pp. 6316–6318.]

In Admiralty.   Suit by the McCaldin Bros. Company and others against the steamship Ciudad de Reus.   Decree for libelants.

Robinson, Fishel & Robinson, for McCaldin Bros. Co.
Wing, Putnam & Burlingham, for the Timmins.
Curtis, Mallet-Provost & Colt, for claimant.

CHATFIELD, District Judge (orally).   I think I will take the last question first.   If a vessel should be rescued, and subsequently totally destroyed, the fact that there was no vessel left, of itself, would not be the only consideration in determining what was salvage.   The present case involves, not one claim of salvage, but at least three separate situations, perhaps divided among five boats.   The claim for salvage in reference to the occurrence over by Staten Island cannot be viewed by what happened after Capt. Roche took charge and the vessel came to Brooklyn.   Nor can the services that are claimed to have been rendered by the boats in preventing the steamer .from smashing into the dock be judged by the services alone that had taken place at Staten Island.   I do not think that the case cited by counsel for claimants, The Steers, has anything to do with this case.   The question here is whether any of these services were salvage services, and, if they were, who is entitled to the benefit of them, and, perhaps, who shares in the responsibility .for any of the situations of danger.

The situation arose originally from a collision, which has been passed upon in another court.   Both the opinion of the court in that case and the testimony offered here indicate that the steamship Mara-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

val came to anchor in such a position that under the influence of a northwest wind and an ebb tide, and under some movement which has not been explained in this court, her bow came in collision with the side of the Ciudad de Reus. The finding has been that that was the fault of the Maraval. That finding, and the record as it stands here, indicate that the Ciudad de Reus had been anchored in a position without moving. There is no evidence that she drifted. The other boat came up and came into collision with her, and as the tide changed to flood the boats moved to starboard, so that the tide and the wind were opposing one another, and the Ciudad de Reus, which was nearer to Staten Island and had a longer anchor chain, swung into such position that her chain was afoul of the chain of the Maraval, an independent situation from that which originally caused the collision. While the vessels were in that position the wind had moderated somewhat, but between 7 and 8 in the morning, as is shown by the report of the Weather Bureau, its velocity was about 20 miles an hour—estimated to be somewhat more than that by the men down the bay, but such estimates are usually greater than the official record. Under this strong wind the vessels were lying in a position where discreet seamanship would indicate that they ought to be separated.

The Maraval, either because she was confident she was not in fault, or because of the appearance of changing her position, refused to move. The Ciudad de Reus apprehended sufficient trouble to cause her to want to move, and she signaled for a tug and a pilot. Those signals and the conduct of the officers would indicate that at that time they were not calling for salvage service; but I think they were in a position where the tugs going to their assistance might reasonably be expected to be recompensed for more than mere towing services. The McCaldin Brothers spent an hour and a half trying to keep the vessel from getting into a worse position, or, rather, in improving her position; and the William J. McCaldin, then coming along, took up the same work, with a hawser from the bow of the steamer. The wind at that time must have been considerable, inasmuch as the two tugs did not extricate the Ciudad de Reus from her situation. The tug Mutual was called in to help, and with their combined efforts the vessels proceeded towards Staten Island. The anchor of the Ciudad de Reus was slipped, which was not done on the authority of the tugs alone, but by the agreement of every one, and they proceeded towards the Staten Island shore. The evidence shows that Capt. Gully, captain of the McCaldin Brothers, at least assumed that the Ciudad de Reus was in a situation from which she should be removed, and that the services which the situation called for were to take her to the nearest dock, which he attempted to do. When Capt. Roche intervened, and the original proposition of taking the Ciudad de Reus to some place where she could be surveyed for repairs had developed into a question whether she should go to Morse's Dock or to some other place, Capt. Roche took charge.

Up to that point I think that the services were worthy of more recompense than the compensation for mere towage, and up to that point the McCaldin Brothers and the William J. McCaldin, and, to a certain extent, the Mutual, had participated. The Maraval's con-

nection with the matter ended right there, and when they started to cross the bay with the Ciudad de Reus Capt. Roche was responsible. While the evidence seems to indicate that the wind was increasing, still the rate of the wind was probably not more than between 30 and 40 miles an hour, or in that neighborhood, and there is nothing to show that crossing the bay was a movement that could not be properly undertaken, or that should not be expected to be successful. Nevertheless, it was done by advice of Capt. Roche, and he undertook it as a towing service at that time, and the Timmins assisted in helping do that. On his own statement there was no reason why he should not tow the boat across there. When engaged in towing her to her destination, the next thing that happened was the hawser parted, and it was the duty of the man who was in charge to endeavor to recover his tow, and Capt. Roche says from that time on it was only an ordinary matter. He could not put the boat in to the dry dock, or in to the Morse Dock; so he eased her up against the wharf, snubbed her around, and backed her up on the mud, and when she cast loose from the wharf let her take a berth broadside, as he would a yacht he was putting up there for the winter. I do not consider that Capt. Roche, in doing that, did any more than his duty in taking care of a vessel that he was towing, and I do not think that the Timmins performed any more services than they owed to the Ciudad de Reus in undertaking to tow her across the bay.

The testimony is that the hawser did not hold on the dock. It is immaterial whether it broke or was cast off. The wind was certainly strong, and a situation arose by the Ciudad de Reus being blown from the dock. The injury to the steamship at that time had nothing to do with the salvage services. The question is whether she would have been injured more if the tugs had not acted as they did. It is apparent that the action of the McCaldin Brothers and of the Mutual, which got around in between the vessel and the dock, prevented the vessel striking on the dock with a great amount of force.; and, in that the America and the William J. McCaldin were doing what they could, I think at that time those four boats put themselves in a position of rescuing this steamship, of doing something for which they should be recompensed. I think the accident to the McCaldin Brothers was regrettable; but to a certain extent it was her business to be able to put her nose against a steamer and exert all her force, even in rough weather. It is her business to take chances of having her condenser break under the movements of the vessel. I do not think that the amount of damage she suffered is, of itself, any measure of the value of her services, any more than, if such an accident had occurred in the course of an ordinary towage service, that it would have increased the price of towing. Nor do I think that the captain of the McCaldin Brothers jumping from the deck of the steamship to the top of the pilot house, of itself, makes an item of salvage. But I do think that the action of Capt. Gully at the time, his promptness in waking his crew up and getting his vessel out from between the steamer and the dock, where she would probably be smashed if she did not break a hole in the steamer, was valuable, and should enter into the situation.

The most difficult question is as to the value of these services. At Staten Island there was no risk to the tugs. The risk to the Ciudad de Reus was problematical, rather than certain. Over at Brooklyn, the risk, after the hawser parted, was greater. As I do not consider that the engineer of a tugboat is responsible for her movements, so I do not consider the captain of the William J. McCaldin, who had nothing to do except to obey, was responsible for attempting to take the boat across the harbor. The difficulty is to know how much this whole service was worth. I think it is one of the cases where the compensation cannot be very large. The time we have taken on the case is far more.

It is evident that the tugs were engaged about five hours, and that the America and the McCaldin Brothers did more work than the others. I think I shall start by the award, as a first item, of $50 to the William J. McCaldin and the Mutual, and of $75 to the McCaldin Brothers and the America. This is for the towage services. In addition to the $75 to the America, I allow $125; in addition to the $50 to the Mutual, I allow $200; in addition to the $50 to the William J. McCaldin, I allow $100; to the McCaldin Brothers I allow $375; and to Capt. Gully I allow $50.

Now, as to the three boats which had something to do with the matter on both sides of the river, I shall simply divide the allowance, one-half to each, so that, if the question arises between the Maraval and the Ciudad de Reus, you have an assessment as to that. This makes the total award to the America $200; to the Mutual $250, $125 on each side of the harbor; to the William J. McCaldin $150, $75 each side of the harbor; to the McCaldin Brothers a total of $500. I think Capt. Gully is entitled to $50 extra out of the total of $500, which would make $275 for Brooklyn and $225 for New York.

The question of the division amongst the captain and crew of the tugs I leave to the parties. The question is whether they wish to litigate the Timmins' responsibility. I have heard nothing as to whether there is another libel in some other District Court as to the question of the parting of this hawser. For all I know they may refuse to pay towage to the Timmins. If they leave it to me, I will allow the Timmins towage.

Mr. Forrester: On their own proofs the hawser snapped as the fault of the McCaldin.

The Court: The Timmins was commanded by Capt. Roche, and was fastened to the starboard quarter of the Ciudad de Reus, and all it did was to help tow all the way around. It was the duty of Capt. Roche to capture his tow. I think the Timmins is entitled to receive five hours' towage, which is understood to be at $10 an hour; and I will so allow it.